Our next case for argument this morning is King v. Ford Motor Company Mr. Keller Good morning, Your Honors. Blatant admissions of employment discrimination are rare. Graham Morton's declaration exposing labor relations should have been front and center. Instead, it was left on the cutting room floor. Ford's claim that it was prejudiced by Morton is pure, unadulterated fiction. Morton was no surprise. He was a Ford employee, the union chair. His name was mentioned eight times in Lawanda King's deposition. Twice during that deposition, she said that Morton told her that she was being punished for taking leave. Additionally... So did the district court judge overlook that in the review of the record? And did you cite specifically to that portion two portions of the deposition in your response to the summary judgment? Because the district court judge would say you did not. Right, and we did not. I will concede that point. So mentioning Mr. Morton in the responses, King then supplements Rule 26 disclosures with those responses. So I'm at a loss as to how Ford can say at page 16... Was that during the motion to reconsider or during the response to the motion for summary judgment? That was the supplementing the disclosures? Yes. That was all done prior to the summary judgment and reconsideration. So how Ford can claim that Morton was never disclosed during discovery is simply beyond me. Morton, excuse me, Ford, knew about its own employee. There was no surprise and hence no prejudice. Wouldn't the district court judge have been allowed under Packer and many other cases to have simply found that you didn't properly cite to that evidence as you've admitted and therefore exclude it in terms of considering that argument at summary judgment? I mean, I think there are plenty of cases, including Packer somewhat recently, that say unless you specifically cite to that evidence in the record, the district court judge is not required to search the record to find it. Yes, and I'm familiar with that case, and I recognize that this argument, it could have been fleshed out better. There's no question about that. But as far as the prejudice issue goes, again, this is an employee. This is not an expert witness. This is not some third party that Ford doesn't know about. But in terms of prejudice, discovery had already closed, had it not? Well, it had already disclosed but, excuse me, closed, but Mr. Morton was mentioned in those depositions before it closed, and those responses, those interrogatory responses were supplemented before the closure of discovery. But even if we pretend Mr. Morton's expose does not exist, it's easy to see the interference and the retaliation of labor relations inflicted. LaWanda King had a habit of invoking her rights. She objected to her supervisor's sexual harassment. She called the anti-harassment hotline. She took FMLA leave. She went to the EEOC. Ford wanted her gone and used the five-day notice as pretext. What is a satisfactory response to the quit notice? That is the question, and it's a question of fact. And there's four reasons, Your Honors. First, King called the medical department. She spoke with Rosemary Campbell, and Ms. Campbell told her the paperwork was sufficient and the quit notice was inerrant. Second, King then calls labor relations three separate times, leaves three messages with three separate labor relations representatives. Instead of responding, Aaron Winn and his cohorts dawdled, not doing their job to ensure King lost hers. Now the following morning, LaWanda King's doctor faxes medical paperwork, indicating that Ms. King is under her care and that she will be on leave until the end of the month. And fourth, there is conflicting evidence as to the deadline of the quit notice. The termination card Aaron Winn signed said it was April 2nd. Throughout his deposition, Mr. Winn said the date was April 2nd. Not until the waning pages of the deposition does he change his mind and say it's April 1st. So Ford can't keep its story straight. So for these reasons, the actions that King took and the actions and inactions of Ford, a reasonable jury could find the response was satisfactory. Now, Your Honor, this is not a... Regardless of that, didn't the district court judge find that Ms. King was not entitled to FMLE, that she wasn't eligible? Correct, Your Honor. And if that's the case, doesn't that negate the arguments you're making? Well, yes, it does to the degree that if eligibility is not found, that's essentially the first element, the primary element that must be met. And as to that... You didn't submit any evidence in summary judgment demonstrating eligibility, correct? Well, we submitted a statement from Ms. King's declaration that she had satisfied the time. And given the fact that... Just kind of an empty statement without any evidence supporting it. Isn't that fair? I would say the analysis was somewhat vacant. But when you combine her declaration, her statement, along with the evidence in the record, which was raised and which is clear, that Ford's timekeeping is shoddy. Ford admits, Mr. Wynn admits himself, that Ford commonly makes mistakes. Was that evidence in existence at the time of the summary judgment motion, or did that only come into play upon the motion for reconsideration? The evidence was from his declaration. So the evidence was in existence before summary judgment. As far as whether that was raised, again, I think these were raised, but they, again, have been admittedly fleshed out more. I would admit that point. But, again, the analysis that you look at is not only what the plaintiff comes forward with, I mean, her evidence, that's obviously an integral part, but also this other evidence, again, which I think is pretty rare, pretty unique, that an employer admits that it has trouble accounting for its own time. And, again, I would invoke Mr. Morton on this issue. And he sheds light on the true nature of labor relations. And this is the same labor relations that calculates, or at least monitors, the hours for the FMLA eligibility. And this is a labor relation that uses AWOLs to ward off the EEOC, that Ms. King repeatedly tangled with labor relations on erroneous AWOLs. And it's also a labor relations that views sexual harassment with all the concern of an elephant for a flea. This is worlds apart from the sanitized, by-the-book labor relations that's portrayed in the response brief. So drawing reasonable inferences from Ms. King, there are a number of questions of fact concerning her FMLA eligibility, whether her response to the five-day quit notice was timely, the deadline for that response, and whether there was interference and retaliation under Title VII and FMLA. And I would also note, what evidence do you submit that demonstrates that the people responsible for the various adverse actions are even aware of her protected activities? Other than conclusory statements, I don't recall any evidence cited to demonstrate a causal connection between the two. Well, Your Honor, the EEOC, the first EEOC filing that Ms. King made in 2012, I think and I recognize that the 90 days expired for her to sue, but I think that demonstrates, that essentially was kind of the opening sell that came from Ms. King. I mean, she had also made four employee anti-harassment hotline calls, and had complained to her supervisor, to Mr. Wynn, I should say, a labor relations rep, about Michael Reese's sexual harassment. And then, again, that opening salvo, the EEOC filing, essentially that put her at loggerheads with labor relations and made her persona non grata. And if you look at Mr. Morton's declaration. What's the evidence of that connection? I mean, is there evidence to show that her supervisor, who was aware of the alleged harassment, was somehow involved in any adverse action? Well, not specifically regarding Michael Reese. But, again, I think it set the tone as far as her being moved from different stations, different sections. She had asked repeatedly to be moved back to the headlight aim. So that was their way of essentially punishing her by not putting her where she had asked to be, despite her seniority, 22, 23 years at the plant, or I should say with Ford. Don't you have to show that who was responsible for making that adverse action and that they somehow had knowledge of the protected activity? Otherwise, again, there's no causal connection. So what's the evidence that that connection exists? Well, I think the connection is that Mr. Wynn and Natalie Derringer, they knew that she had complained repeatedly, that she had called this hotline. And they're obviously the cabal that's in labor relations that rammed through this termination card. So I think as far as the connection goes, admittedly it's not on day one she complains and day three. The connection is not that tight, but it's there in the sense that labor relations was essentially altogether. And, again, whether we can look at Grant Wharton's declaration or not, I think given the fact that she repeatedly complained to her supervisors, to labor relations, and ultimately to the EEOC, I think that is a backdrop that demonstrates that there is a connection. So I see them in my rebuttal. If there's no further questions, I would reserve. Thank you. Certainly, counsel. Mr. Terani. May it please the court, Amirah Terani for defendant Ford Motor Company. The district court correctly granted summary judgment to Ford because no reasonable jury could find that plaintiff was terminated or experienced other adverse employment action as a result of her protected activity. The only reasonable record-based conclusion is that the plaintiff was terminated because she failed to provide a satisfactory explanation for her multi-week absence from work and that none of the other adverse actions alleged by plaintiff had any causal link to her protected activity. I'd like to start with the Morton declaration. Plaintiff did not disclose Mr. Morton in her initial Rule 26a disclosure or in her amended Rule 26a disclosure. Plaintiff now relies on her fifth supplemental set of interrogatory responses to assert that plaintiff did, in fact, disclose Mr. Morton. But those interrogatory responses were not served until December 12, 2014, which is six weeks after the close of discovery on October 30, 2014. Plaintiff's fifth supplemental set of responses, therefore, cannot cure her Rule 26a violation. In addition, the fleeting references to Mr. Morton in plaintiff's deposition are not a remedy for her failure to disclose Mr. Morton in her Rule 26a disclosures. If an opposing party were required to depose every individual referenced in a multi-hundred page deposition, then discovery would never come to an end and would be far more burdensome and costly than it already is. Plaintiff's deposition spanned 350 pages. There was nothing in that deposition to alert Ford that Mr. Morton had the type of discoverable information that she ultimately came forward with in his declaration. When she became aware that Mr. Morton had discoverable information, she was obligated to request that discovery be reopened or that summary judgment briefing be extended. She didn't ask for either of those alternative measures of relief. The district court, therefore, acted well within its discretion when it struck the Morton declaration in light of the significant prejudice to Ford. Ford had no opportunity to depose Mr. Morton in advance of the summary judgment briefing in this case. According to plaintiff... So you acknowledge that an appropriate disclosure regarding the subject of Mr. Morton's testimony came six weeks after the close of discovery. I do not concede, Your Honor, that the disclosure in the fifth supplemental set of interrogatory responses was sufficient, but it was untimely. If the court were to consider it, it's still not sufficient, Your Honor, because Mr. Morton was one of 45 individuals mentioned in that 19-page document. There was nothing to tip off Ford that Mr. Morton was going to come forward and be what plaintiff describes as the smoking gun. If we find that it was a sufficient disclosure, couldn't you then have sought an extension or a reopening of discovery at that time? Ford was not obligated to request that alternative. It was plaintiff's obligation when she discovered after the close of discovery that Mr. Morton had what she describes as highly relevant information to offer up the alternative of reopening discovery so that Ford would have the opportunity to depose her star witness in advance of summary judgment briefing. Plaintiff never suggested to the district court that discovery be reopened or that summary judgment briefing be pushed back. And you didn't file a motion to strike those late submissions? We didn't move to strike the supplemental discovery responses. We did move to strike Mr. Morton's declaration. The district court ordered supplemental briefing on that issue and acted well within its discretion in light of the Rule 26a violation and the severe prejudice to Ford to strike the Morton declaration. On the issue of FMLA eligibility, plaintiff rests her arguments on her unadorned conclusory assertion that if improper absences without leave and improper disciplines are removed from her record, then she would have worked the requisite 1,250 hours in the 12-month period preceding her alleged request for FMLA leave in March of 2013. That type of conclusory, unsubstantiated assertion is insufficient to give rise to a disputed issue of fact for trial. Do you disagree with Appellant's counsel that Ford's own affidavit undermined the accuracy of its timekeeping records? I don't agree with that characterization of Ford's timekeeping records. Ford has acknowledged that on occasion, in light of the fact that the Chicago Assembly Plant employs 4,000 hourly employees working three different shifts, that timekeeping errors do occur, but that is far different from the type of systematic timekeeping violations that plaintiff alleges. To substantiate that position, plaintiff relies on her unproven allegations in her separate complaint to the Illinois Department of Labor, where she alleges that she was underpaid on various days for work at the Chicago Assembly Plant. But those allegations are just that. They are unproven allegations that have no evidentiary value in this proceeding and therefore could not be a basis for a reasonable jury to find that there were the type of systematic deficiencies in Ford's timekeeping that plaintiff alleges. In any event, setting that issue aside, plaintiff still had the obligation to come forward with some evidence that she had worked the requisite 1,250 hours during the 12-month period preceding her alleged FMLA request, and plaintiff relies exclusively on the unadorned assertion that if improper absences without leave and improper discipline is removed from her record, that she would meet that 1,250-hour threshold. But she doesn't provide any basis for that calculation. She doesn't provide any estimate of the number of hours that she worked within that 12-month period. She doesn't identify which absences without leave or which disciplines were allegedly improper or identify why those actions were improper. On that basis, no jury could find in plaintiff's favor with respect to FMLA eligibility. In any event, plaintiff's FMLA interference claim fails for the same reason as her retaliatory discharge claims, and that is plaintiff failed to comply with the standardized, objective, collectively bargained requirements of Ford's 5-day quit process. So if you believe or if you accept, which at summary judgment I would think you would have to, that Nurse Campbell did in fact tell King that you've given us enough information to remain on leave until March 28th, wouldn't your 5-day quit notice issued as of March 23rd have been inappropriate then because ostensibly you had sufficient information at that time that her leave was documented? No, Your Honor. The 5-day quit notice required plaintiff either to return to work by April 1st, 2013, or provide a satisfactory reason to the Human Resources Department for her continued absence from work. Plaintiff does not provide any evidence of her communications with the Human Resources Department. In any event, there's no evidence to suggest that there was some type of grand scheme or conspiracy between Miss Campbell in the Medical Department and Mr. Wynn in the Human Resources Department to lead plaintiff astray and somehow place obstacles in her way to complying with the 5-day quit notice. That is conjecture, it's far-fetched, and it's insufficient for plaintiff to surmount the summary judgment threshold. So you're saying even if the 5-day quit notice was inappropriately issued, there's still no evidence to suggest it was retaliatory? That's correct, Your Honor, but there is no evidence in our view that the 5-day quit notice was improperly issued. Because whatever Nurse Campbell said, you're not acknowledging that Ford knew it? We're not acknowledging that she was in a position to determine that the 5-day quit notice was improperly issued. The 5-day quit notice is automatically generated by the Medical Department once an employee is absent without leave or her leave has expired. On that basis, the Human Resources Department then sends out the 5-day quit notice. That notice is clear that Miss King had two options, either return to work within five working days or provide a satisfactory reason to the Human Resources Department for her continued absence. Plaintiff doesn't point to any evidence that she provided that satisfactory reason to the Human Resources Department, and she doesn't provide any evidence that Miss Campbell in the Medical Department was somehow in cahoots with Mr. Wynn, the HR decision-maker, who terminated plaintiff. Mr. Wynn testified that he terminated plaintiff because she failed to comply with the obligations of the 5-day quit process. This court has already examined the 5-day quit process in Brown v. Automotive Components, a 2010 decision, and concluded that an FMLA plaintiff who requests FMLA leave must still adhere to the requirements of the 5-day quit process because that process is objective, it's standardized, and it's collectively bargained on behalf of Ford's employees. Plaintiff had every opportunity to provide the requisite information to the Human Resources Department. She failed to do that. She at most left voicemail messages for the Human Resources Department, but in this litigation she never once came forward with the content of those voicemail messages. She also points to an April 2nd fax from her treating physician, but that fax was sent one day too late on April 2nd rather than April 1st, the deadline for compliance, and it was sent to the wrong entity. It was sent to Ford's third-party benefits administrator, Unicare, not to the Human Resources Department. The language of the 5-day quit notice is clear. It's unambiguous that the satisfactory reason for continued absence must be provided to the Human Resources Department. Plaintiff failed to meet that burden, and there is no tribal issue of fact as to a causal link between plaintiff's past protected activity and her termination in this case because Mr. Wynn testified clearly and unambiguously that he terminated plaintiff because of her failure to comply with the 5-day quit process. There is no evidence that calls into question Mr. Wynn's motive. There's no evidence of some grand conspiracy between Mr. Wynn and the medical department to lead plaintiff astray. This is a process that is objective, it's standardized, and it's the means by which Ford manages leaves and terminations of the 4,000 hourly employees at this plant. It's a nondiscretionary process that enables Ford to manage its employees in an orderly, reasonable, even-handed manner. Plaintiff had access to union representatives if she had any questions about how to comply with this notice. She, in fact, indicates that she spoke to those union representatives during the 5-day period. If she had any doubts about what was needed to comply, the resources were available to her. The union would not have agreed to this 5-day quit process if it weren't fair, standardized, and objective. So for all of these reasons, this court should affirm summary judgment in favor of Ford. Thank you. Thank you, counsel. Anything further, Mr. Kelter? Yes, Your Honor. Ford tries to portray this case as one in which an employee did not follow corporate protocol. It's the precise opposite. King made multiple efforts to comply with the 5-day quit notice. Worse, Ford worked to undermine those efforts. Ford should not be allowed to capitalize, to prevail on its own dereliction of duty in ignoring King's three voicemails. Counsel talks a lot about the paperwork and labor relations in the medical department. Well, these two departments, they were the Bermuda Triangle of the corporate world. Documents went in and they never came out. So how King should be held responsible for the ineptitude and the animus of the medical department and labor relations is beyond me. As far as Mr. Morton, it's the combination of factors. The fact that he was mentioned in the deposition two times, specifically that he had knowledge that Ms. King was being punished for taking leave. It's, in addition to that, the interrogatory responses. And finally, the fact, again, that he is a Ford employee, not an expert witness, not some stranger, third party, unrelated. So it's the confluence of these things. And furthermore, Ford had the opportunity to come forward with affidavits from Derringer, from Drummer, from Larisse, from Giles, saying that Mr. Morton was being untruthful or incorrect. And furthermore, the test on this issue, on the disclosure issue, is prejudice. The test is not whether a formal Rule 26 template was used. If that was the test, we would lose. But the test is prejudice. And based on the fact that Mr. Morton is a Ford employee and the union chair, there cannot be any surprise. As for counsel's statements about a grand conspiracy, we never alleged this, we never argued this. We're not sure if Ms. Campbell and the medical department had any relation or connection with the labor relations. And whether it was ineptitude or animus, we don't know. And those are questions for a jury. And finally, counsel states that Ms. King should have called the union. Well, she did call the union, and the union told her, make sure you call labor relations, call the medical department, call everybody you can. And she did that. And labor relations, again, simply ignored her calls and never responded. They should not be able to capitalize on that. If there are no further questions, I would ask the court to reverse and thank the court for its time. Thank you very much. Counsel, the case is taken under advisement.